IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TERRENCE CHEN, | Case No. 3:15-cv-00594-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| CAROLYN W. COLVIN,<br>Commissioner of Social Security, | |
| Defendant. | |

**BECKERMAN, Magistrate Judge.**

Terrence Chen ("Chen") appeals the Commissioner of the Social Security Administration's ("Commissioner") denial of his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Court affirms the Commissioner's decision.

# I. FACTS AND PROCEDURAL HISTORY

Chen stands five-feet, nine-inches tall and weighs approximately 168 pounds. He was born in September 1961, making him fifty years old on July 1, 2010, the alleged disability onset date. Chen has a limited education, reads and speaks limited English, and has past work experience as a housekeeper, dishwasher, and caregiver for his elderly father. Chen stopped working after the death of his father in July 2010. Chen protectively filed an application for disability insurance benefits on May 19, 2011, alleging disability due primarily to eye, leg, and back pain, and depression.

On May 5, 2011, roughly nine months post-alleged disability onset date, Chen visited Karen Briggs ("Nurse Briggs"), a nurse practitioner at the East County Primary Care Clinic ("Clinic"), complaining of headaches, depression, and insomnia. The Clinic had provided primary care services to Chen since April 2009. During his May 5, 2011 appointment, Chen reported having "family issues" and trouble sleeping. Chen told Nurse Briggs that he had been a caregiver for his father, who passed away in the previous year. Chen indicated that he did not wish to seek treatment but that "his mother brought him" to the Clinic. (Tr. 299.) Nurse Briggs informed Chen about depression and prescribed trazodone for insomnia. The following day, a Clinic nurse telephoned Chen to set an appointment for Chen's intake into the Clinic's depression care management program.

On May 11, 2011, Chen returned to the Clinic complaining of redness and pain in his left eye that had lasted for one week and disturbed his sleep. Chen's mother, who accompanied him to the appointment, reported that Chen "had been having some improvement in his symptoms of depression." (Tr. 287.) Chen commented that "having no job" was one of his current stressors, and he indicated that he "would enjoy being a cab driver." (Tr. 291.) Chen also reported that he enjoyed helping with food preparation and janitorial tasks at his temple. Nurse Briggs diagnosed Chen with

Page 2 - OPINION AND ORDER

conjunctivitis and depression, and prescribed eyedrops and citalopram, respectively. When the eye redness and pain had not diminished by May 16, 2011, Nurse Briggs referred Chen to an ophthalmologist to explore the possibility of iritis in his left eye.

On May 17, 2011, two days before Chen filed his application for disability insurance benefits, Chen reported to the Portland Vision Center complaining of pain, photophobia, and irritation in his left eye over a period of two weeks. Examining physician Dr. Charles Statton ("Dr. Statton"), an optometrist, diagnosed Chen with iritis in the left eye and prescribed 5% homatropine drops for treatment. Dr. Statton suspected Chen's eye irritation may have had a systemic cause and ordered follow-up appointments for the next few days. Chen continued to report pain in his left eye that woke him in the night. On one of the subsequent visits, he reported failing to use the homatropine drops as prescribed.

On May 20, 2011, Chen was examined by Dr. Rory Allar ("Dr. Allar"), for redness, pain, and decreased vision in his left eye. During a follow-up visit on June 6, 2011, Dr. Allar diagnosed Chen with acute uveitis. Dr. Allar also noted that Chen had "no back pain" and "no joint pain in his hands," but that he was positive for HLA-B27, an antigen strongly associated with ankylosing spondylitis. (Tr. 452.)

On June 1, 2011, Chen reported to Kathleen Thomes ("Nurse Thomes"), a registered nurse at the Clinic, for depression care management. Nurse Thomes noted that Chen seemed angry and that he reported that he had not been taking his anti-depression medication as prescribed. Chen "talked at length about his sister causing his ex-wife to leave him." (Tr. 282.) Nurse Thomes introduced Chen to Joanne Serna ("Serna"), a licensed clinical social worker, who agreed to meet with Chen for weekly mental health counseling. Serna noted that Chen appeared "very angry" and was difficult

to engage. (Tr. 274.) Serna also reported that Chen "may have some cognitive impairments, delusions, or paranoia" that she would assess further in future appointments. (Tr. 274.) Serna encouraged Chen to continue taking his medication.

Chen presented to the Clinic several times over the next few weeks for behavioral health visits. On June 8, 2011, Chen told Serna about fighting in his family, including his belief that his sister "forced him to sell [his] house in [New York] and took his 401K." (Tr. 272). Chen also reported that he enjoyed gardening and that he had "enjoyed his work in [New York]" and "missed being able to work." (Tr. 272-73.) During a follow-up visit with Serna on June 23, 2011, Chen reported that he was taking citalopram regularly, but that he had stopped taking trazodone because it made him dizzy. Serna noted that, in speaking with Chen, she had difficulty determining "what information is real and what might be somewhat delusional or paranoid." (Tr. 272.)

On a July 7, 2011 visit with Nurse Thomes, Chen asserted that he never forgot to take his medication, that he had "been doing a lot of yard work," and that he drove to the temple twice. (Tr. 270.) Chen explained that when he had occasional trouble sleeping, he would do yoga or another exercise to relax. Nurse Thomes reported that Chen was much improved. Later that month, Serna reported that Chen appeared to be better, but that "his mother states he continues to get very angry if he hears his sister's name." (Tr. 269.)

With the help of an interpreter, Chen completed an Adult Function report on August 9, 2011, in support of his application for disability insurance benefits. Chen reported that his impairments (depression, insomnia, headaches, chest pain at night, and poor memory) made him easily angered and unable to trust people. Chen described his typical day as making breakfast, washing his car and clothing, walking around the backyard and planting, watching television, going to the library, and

Page 4 - OPINION AND ORDER

reading to his daughter. Chen articulated that his conditions did not affect his ability to dress, bathe, feed himself, or use the toilet, but that he was unwilling to shave or care for his hair. Chen reported that he had trouble remembering to pay bills and turn off the fire and water, but that he was able to (very slowly) do laundry, wash dishes, shop for groceries two to three times a week, and perform basic household repairs. Chen reported that he went to a Chinese temple every Saturday, and that he volunteered once a week. Chen explained that he was easily angered by his family, and that he had trouble getting along with friends and neighbors.

Chen visited Nurse Briggs on September 21, 2011, complaining of leg, hip, and groin pain. Chen informed Nurse Briggs that he had been in a motorcycle accident nineteen years earlier. Nurse Briggs examined Chen and noted that Chen had full range of motion without pain in his back, and that his testicular exam was normal. Nurse Briggs ordered x-rays of Chen's hips and pelvis, which showed "both hips with arthritis and possible sacroiliitis." (Tr. 499.)

On November 18, 2011, Chen presented to Dr. Jacqueline Ng ("Dr. Ng"), at the Oregon Health and Science University's vision clinic, complaining of itchiness in his left eye. During the examination, Chen reported that he had no new joint or back pain. Dr. Ng treated Chen for allergies and dry eye syndrome.

On December 6, 2011, Dr. Ann Marie Miner ("Dr. Miner"), Doctor of Psychology, examined Chen at the request of the Department of Disability Services. Dr. Miner noted, among other things, that Chen had an adequate fund of knowledge and information, good level of concentration, and that he was able to do some simple calculations. She assessed that Chen's depressive symptoms were likely "treatable to a certain degree," but that "cultural differences may limit the extent to which [Chen] accesses available treatment." (Tr. 482.) Dr. Miner's diagnoses were: moderate depression

(Axis I); mild narcissistic traits (Axis II); economic and occupational problems (Axis IV); acculturation problems (Axis IV); and a Global Assessment of Functioning ("GAF") score of 55.[1] Dr. Miner's impression was that "with proper instructions there do not appear to be mental health related barriers which would prevent the claimant from engaging in simple and repetitive tasks," but that Chen "may experience difficulty interacting appropriately with supervisors, coworkers, and the public, particularly if he becomes agitated." (Tr. 483.)

Dr. Mack Stephenson ("Dr. Stephenson"), a non-examining state agency psychologist, completed a psychiatric review technique assessment on December 22, 2011, wherein he evaluated Chen's impairments under listing 12.04 (affective disorders). After reviewing the relevant medical evidence, Dr. Stephenson concluded that the limitations imposed by Chen's impairments failed to satisfy listing 12.04.

That same day, December 22, 2011, Dr. Stephenson completed a mental residual functional capacity assessment, which described Chen as moderately limited in six of twenty categories of mental activity, and not significantly limited in fourteen. Dr. Stephenson added that Chen should be limited to simple one- to two-step commands, may require initial instructions to be given in his native language (Burmese), is capable of brief, structured, routine interactions with the public, and should not work in areas that demand close coordination with coworkers due to difficulties getting along with others.

---

[1] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. *Vargas v. Lambert*, 159 F.3d 1161, 1172 (9th Cir. 1998) (citation omitted). A GAF score of 55 indicates at least moderate symptoms or moderate difficulty in social, occupational, or social functioning. *Id.*

Chen visited Nurse Briggs on January 5, 2012, complaining of muscle pain in his left leg above the knee and in his left forearm. Chen claimed that he was injured while doing yard work or carrying garbage. Chen also reported that his depression was "much better," but that he was still unable to work. Nurse Briggs treated Chen for tendonitis of the left elbow, and sprain and strain in the hip and thigh.

Dr. Paul Rethinger ("Dr. Rethinger"), a non-examining state agency psychologist, completed a second psychiatric review technique assessment on February 27, 2012, wherein he evaluated Chen's impairments under listing 12.04 (affective disorders). After reviewing the relevant medical evidence, Dr. Rethinger agreed with Dr. Stephenson that Chen's impairments did not satisfy listing 12.04.

Also on February 27, 2012, Dr. Rethinger completed a second mental residual functional capacity assessment, which described Chen as moderately limited in five of twenty categories of mental activity and not significantly limited in fifteen. Dr. Rethinger agreed with Dr. Stephenson in all other respects.

Chen returned to Nurse Briggs' office on March 8, 2012, complaining of numbness and pain in his left leg. Chen indicated that the symptoms had lasted more than a year, and that he had not experienced any injury to his back or hip. Nurse Briggs ordered a radiological exam of Chen's spine, in which the right sacroiliac ("SI") joint appeared "somewhat sclerotic" and the left SI joint appeared "mildly sclerotic, and close to normal." (Tr. 509.)

On October 4, 2012, Chen reported to a rheumatologist for a Magnetic Resonance Imaging ("MRI") test that showed "partial right sacroiliac ankylosis and severe left sacroiliac joint." (Tr. 536.) The rheumatologist recommended that Nurse Briggs prescribe a different medication for pain.

On October 31, 2012, Chen visited Nurse Briggs, complaining of pain in his left knee. Chen informed Nurse Briggs that the knee pain was "relieved when jogging" and Nurse Briggs noted that "increased physical activity seems to make it resolve whenever he has discomfort." (Tr. 549.)

On January 16, 2013, Chen reported to Nurse Briggs, following up on his rheumatology appointment. Chen reported only a "slight amount of pain to the left upper thigh" and added that he "had been jogging in the morning and his pain has been better." (Tr. 543.)

On May 7, 2013, Chen presented to the Clinic complaining of headaches, low energy, muscle aches, and dizziness. Dr. Joseph Eisenberg ("Dr. Eisenberg") examined Chen, observed that Chen had "normal strength in feet and legs," and prescribed ibuprofen for pain. (Tr. 539.) Dr. Eisenberg also recommended that Chen continue to see Serna for depression management.

An administrative law judge ("ALJ") convened a hearing on July 24, 2013, at which Chen testified about the limitations resulting from his impairments. Chen testified that he suffered from several physical limitations, including blurred vision, headaches, insomnia, fainting spells, chest pain, shortness of breath, and pain in his hands, feet, upper thighs, and lower back. When asked about the subjective symptoms of his hip osteoarthritis/sacroiliitis diagnosis at the hearing, Chen explicitly denied having any hip pain. Instead, Chen testified that an injury to his left thigh (reportedly from a motorcycle accident many years earlier) caused painful "attacks" in his leg only during cold weather, and that his medication helped to alleviate that pain when it occurred. (Tr. 44.)[2] When asked about the subjective symptoms of his ankylosing spondylitis diagnosis, Chen testified that he had lower back pain when he sat for long periods of time. (Tr. 49.)

---

[2] The ALJ accounted for this temperature-triggered pain when determining Chen's residual functional capacity by adding the limitation that Chen "should avoid exposure to extreme cold or heat." (Tr. 24.)

Page 8 - OPINION AND ORDER

Chen also described feeling depressed, and testified that he regularly attended appointments with Serna and took prescribed medications that alleviated his symptoms "for a little while." (Tr. 43.) He claimed that his depression stemmed from anger at his sister and his ex-wife, who he believed was having an affair with his brother-in-law. Chen did not describe any symptoms of his depression, other than insomnia and saying "cuss words every now and then." (Tr. 41.) Chen testified that his eyes were weak and his vision was blurry. Chen reported that he could understand "a little bit" of spoken English, but that he had difficulty understanding written English because he had little "exposure to the outside world." (Tr. 45.) When asked whether he thought he could work as a housekeeper again, Chen responded that doing such work would cause pain in his feet, hands, and head to "come back," and that he "cannot stand such work pressure." (Tr. 44.) Chen added that he applied for a job as a driver but did not receive a call back from the potential employer.

Chen's mother, Myint Swe ("Swe"), also testified at the hearing. Swe stated that Chen suffered from sleeplessness because he believed his sister was taking money from him. Swe indicated that this was not true, and that Chen was "wrong in thinking such things." (Tr. 52.) Swe reported that Chen sustained a head injury when he was young, and that he was hospitalized for three weeks after the injury.

The ALJ then posed a series of questions to a vocational expert ("VE") who testified at Chen's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Chen's age, education, and work experience could perform medium exertion work, subject to the following limitations: (1) the hypothetical worker is limited to simple, routine, and repetitive tasks that are consistent with unskilled work; (2) the hypothetical worker should avoid exposure to extreme cold or heat, and even moderate exposure to hazards; (3) the hypothetical worker should have no contact

with the public, and only occasional contact with coworkers and supervisors; and (4) the hypothetical worker is limited to work that can be demonstrated through hands-on, one-on-one instruction, as opposed to written instructions. The VE stated that the hypothetical worker could be employed as a housekeeper and cleaner. The VE also stated that there were 436,000 cleaner jobs available in the national economy, including "a little over 7,000" jobs available in the region. (Tr. 55.)

Responding to the ALJ's second and third hypotheticals, the VE testified that the hypothetical worker could not sustain competitive employment if: (1) he "would be off task and, therefore, less productive than co-workers for [fifteen] to [twenty] percent of the workday," or (2) "would get into a conflict with either a co-worker or a supervisor one time per week . . . on an ongoing basis." (Tr. 55-56.)

In a written decision issued on August 15, 2013, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Chen was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Chen's petition for review, making the ALJ's decision the Commissioner's final decision. Chen timely appealed to federal court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

**A.    Legal Standard**

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); *Bustamante*, 262 F.3d at 953-54.

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.     The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Chen had not engaged in substantial gainful activity since July 1, 2010, the alleged disability onset date. At the second step of the process, the ALJ determined that Chen had the severe medically determinable impairments of depression, bilateral hip osteoarthritis/sacroiliitis, ankylosing spondylitis, and headaches.

At the third step, the ALJ found that Chen's combination of impairments was not the equivalent of those on the Listing of Impairments.[3] The ALJ then assessed Chen's residual functional capacity ("RFC") and found that he could perform medium work, as defined under 20 C.F.R. § 404.1567(c), subject to the following limitations: (1) Chen needs to avoid exposure to extreme cold or heat, and even moderate exposure to hazards; (2) Chen should be limited to simple, routine, repetitive tasks that are consistent with unskilled work; (3) Chen should have no contact with the public, but may have occasional contact with co-workers and supervisors; and (4) Chen needs to be limited to work that can be demonstrated through hands-on, one-on-one instruction, as opposed to written instructions.

At the fourth step, the ALJ concluded that Chen was capable of performing his past relevant work as a housekeeper, as the position did not require Chen to perform any work-related activities that were precluded by his RFC. Although the ALJ's step-four finding was sufficient to conclude that benefits should be denied, the ALJ proceeded to the fifth step and found, as an alternative reason to deny Chen's application for disability insurance benefits, that there were other jobs existing in significant numbers in the national economy that Chen could perform, such as work as a cleaner. (DOT 919-687-014). The ALJ thus concluded that Chen was not disabled within the meaning of the Social Security Act.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec.*

---

[3] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

*Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

Chen's argument on appeal is that the ALJ erred by failing to offer specific, clear, and convincing reasons for rejecting his subjective symptom testimony. As explained below, the Court finds that the ALJ's credibility determination is reasonable and supported by substantial evidence in the record.

**A.     Applicable Law**

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan*, 169 F.3d at 600).

///

B.  **Application of Law to Fact**

There is no affirmative evidence that Chen is malingering and, therefore, the ALJ was required to provide specific, clear, and convincing reasons for discrediting Chen's testimony. As explained below, the Court concludes that the ALJ satisfied the standard.

First, the ALJ found that despite Chen's "severe impairments" of depression, bilateral hip osteoarthritis/sacroiliitis, ankylosing spondylitis, and headaches, his claims of the conditions' debilitating effects were not supported by the objective medical evidence.[4] (Tr. 22.) At the hearing, Chen failed to establish that his symptoms had any functional impact on his ability to work, offering little testimonial evidence to supplement the medical record. As a result, the ALJ relied on the medical record to fill gaps in Chen's testimony. An ALJ may consider the objective medical evidence as one factor in considering whether to discredit a claimant. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir.2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."). As the ALJ observed, although the "medically determinable impairments could reasonably be expected to cause the alleged symptoms," including pain, the "intensity, persistence, and limiting effects" were

---

[4] Chen asserts that his medical record "contains MRI evidence of profound SI joint pathology," and suggests that this diagnosis is dispositive of the issue of disability. However, an ALJ's analysis requires more than reading medical evidence or laboratory findings of a medically determinable impairment that could reasonably be expected to produce certain symptoms, such as pain. If such objective evidence exists, the ALJ "must then evaluate the intensity and persistence" of the symptoms in order to determine how the symptoms "limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529. The Court disagrees with Chen's assertion that, because "SI joint pathology is known to cause leg pain . . . [Chen's] leg pain was well supported." (Pl.'s Br. at 8.) Further, Chen's allegation that the ALJ erred by failing specifically to address the alleged "SI joint impairment" is unfounded. The ALJ provided several clear and convincing reasons for discounting this claim, along with Chen's other claims of disability.

Page 15 - OPINION AND ORDER

not supported by the medical record, which "document no significant reflex, sensory, or motor loss," or other indicia of hindered movement. (Tr. 23, 25.)

The medical records indicate that Chen had a history of intermittent complaints of pain in his low back, hip, and leg, but that the pain was managed with medicine and alleviated by increased physical activity. Physical examination revealed that Chen's strength, gait, and balance were all normal. Further, the ALJ found no indication in the record that Chen's diagnosis of ankylosing spondylitis resulted in the limitations outlined in listing 14.09, and therefore did not affect Chen's ability to work.[5] The ALJ also reviewed Chen's behavioral health treatment record and noted that Chen's "symptoms of depression are largely situational," and that his prescribed medications were effective in reducing those symptoms. (Tr. 25.) The record also indicated that Chen had contact with his neighbors, that he regularly spent time with his mother and daughter, and that he had not experienced any extended episodes of decompensation. The ALJ relied on this evidence in deciding that Chen's depression was not a disabling limitation.

Second, the ALJ discounted Chen's claims based on his reported activities of daily living, which the ALJ found to be inconsistent with allegations of disability. Engaging in "activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (citations omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (holding that when a claimant's daily

---

[5] Listing 14.09(C)(2) requires a showing of anklyosing spondylitis with (1) fixation of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at thirty degrees or more flexion (but less than forty-five degrees) measured from the vertical position (zero degrees), and (2) involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity. *See* 20 C.F.R. Pt. 404, subpt. P, App. 1, § 14.09(C)(2).

activities "contradict claims of a totally debilitating impairment," performance of those activities may serve as a basis for discrediting a claimant). The ALJ cited Chen's reported ability to participate in "activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 27.) Indeed, Chen reported to examining medical professionals that he enjoyed jogging, bicycling, gardening, yoga, and walking around his yard or a nearby track regularly, and that such activities helped to alleviate, rather than amplify, his pain. Chen also testified that he was able to perform household chores, go grocery shopping, attend his daughter's sporting events, shop at the mall, volunteer, and care for stray cats. The ALJ found these activities inconsistent with a disability, but consistent with the RFC of "medium work."[6]

Third, the ALJ reasoned that Chen's subjective symptom claims were not credible based on evidence that Chen's reported conditions were intermittent, and managed with treatment or medication. Impairments that can be controlled effectively with medication or treatment are not disabling. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *see also Nathan v. Colvin*, 551 F.App'x 404, 407 (9th Cir. 2014) (finding that there was substantial evidence for an ALJ to discredit a claim of pain when the claimant "provided neither evidence of how this pain had a functional effect on her ability to perform work, nor evidence to refute the conclusion that the pain could be managed with proper medication"). The treatment for Chen's joint pain consisted of prescriptions for nonsteroidal anti-inflammatory pain relievers, including ibuprofen, indomethacin, and meloxicam. Chen reported that these medications had been effective at managing his pain. The ALJ also pointed to the analysis of Dr. Miner, who opined that Chen's depression

---

[6] Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. § 404.1567(c). If someone can do medium work, he can also do sedentary and light work.

symptoms were also likely treatable. The ALJ noted that Chen's depression symptoms had improved with treatment and changed circumstances.[7] Chen reported to Serna that he felt "pretty good, except for when he hears his sister's or ex-wife's name," and Serna's treatment notes report consistent improvement in Chen's depression symptoms during certain extended periods of time.[8] (Tr. 490.) Treatment notes that include signs of improvement can support an adverse credibility determination. *See Cadena v. Astrue*, 365 F.App'x 777, 780 (9th Cir. 2010) (concluding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, which was undermined by, *inter alia*, treatment notes that "included signs of improvement").

In addition to the foregoing, the ALJ provided several other clear and convincing reasons for rejecting Chen's subjective symptom claims. The ALJ noted that Chen had "not been fully compliant at times with taking prescribed medications." (Tr. 26.) Medical noncompliance is a clear and convincing reason for discounting a claimant's credibility. *Davies v. Colvin,* No. 6:14-cv-00491-MC, 2015 WL 4571107, at *4 (D. Or. July 28, 2015); *Bowers,* 2012 WL 2401642, at *9. The ALJ also noted that the record contained no documentation to substantiate Chen's allegations of brain injury, and it did not show consistent complaints of foot and hand pain, fainting spells, chest pain, or shortness of breath, as alleged at the hearing. The ALJ did not rely on this inconsistency to make a

---

[7] Changed circumstances that affected Chen's symptoms include Chen's mother returning from a visit to Asia, not hearing his sister's name, or talking about or doing pleasant activities.

[8] Chen's anger was reportedly only directed at his family members, so the ALJ determined that it likely would not be a problem in the workplace. However, "out of an abundance of caution," the ALJ decided to include a limitation on interaction with members of the public and with coworkers in Chen's residual functional capacity determination. (Tr. 26.)

Page 18 - OPINION AND ORDER

sweeping credibility determination, as Chen argues.[9] Rather, the ALJ merely pointed to the lack of support for the claims in the record as clear and convincing evidence to discredit them. *Cf. Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (noting that inconsistent statements and a tendency to exaggerate symptoms constitute specific, clear, and convincing reasons for discounting a claimant's subjective symptom testimony).

Finally, the ALJ based his determination on evidence suggesting that Chen "considers himself capable of performing some type of work activity." (Tr. 27.) In reaching this conclusion, the ALJ relied on Chen's testimony that he had looked for work as a driver for St. Vincent de Paul in 2009, and again in 2011. The ALJ also pointed to evidence in the record that Chen had reported he was depressed primarily because he did not have a job, and he thought he would enjoy working as a cab driver.

In summary, the Court concludes that the ALJ's evaluation of Chen's symptom testimony is reasonable and supported by substantial evidence in the record. *See Rollins*, 261 F.3d at 856 ("[T]he ALJ's interpretation of [the pertinent] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it.")

---

[9] Chen points to SSR 16-3p (Mar. 28, 2016), which restricts ALJs from "assess[ing] an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p. Whether the regulation applies retroactively or not, the Court is not convinced that the ALJ based his determination on Chen's overall character for truthfulness. The ALJ evaluated the evidence of Chen's alleged subjective symptoms, finding that some were supported by testimony and the medical record, while others were not. The ALJ found, for example, that Chen's alleged hand, foot, and chest pain, shortness of breath, and fainting spells were unsupported, but that others, including bilateral hip osteoarthritis/sacroiliitis, were severe impairments. The ALJ did not discount all of Chen's complaints merely because some of his complaints were inconsistent with the record evidence.

## V. CONCLUSION

For the reasons stated, the Court affirms the Commissioner's decision because it is free from harmful legal error, and supported by substantial evidence in the record.

**IT IS SO ORDERED.**

Dated this 11th day of August, 2016.

                                                    STACIE F. BECKERMAN
                                                    United States Magistrate Judge